73

Argued and submitted April 21, 1993, reversed in part; otherwise affirmed
July 6, 1994

OREGON COUNTRY FAIR,
*Petitioner,*

*v.*

The Filings of the
NATIONAL COUNCIL ON
COMPENSATION INSURANCE
and SAIF Corporation,
*Respondents.*

(91-03-010; CA A75377)

877 P2d 1207

Russell D. Poppe argued the cause for petitioner. With him on the briefs were Lori R. Waldrop and Speer, Jones, Poppe & Wolf.

Michael O. Whitty, Special Assistant Attorney General, argued the cause for respondent SAIF Corporation. With him on the brief were Charles S. Crookham, Attorney General, and Virginia L. Linder, Solicitor General.

Leary C. Jones waived appearance for respondent National Council on Compensation Insurance.

Before Deits, Presiding Judge, and Riggs and Haselton,* Judges.

HASELTON, J.

---

* Haselton, J., *vice* Durham, J.

74-b

## HASELTON, J.

Oregon Country Fair (Fair) seeks review of a Department of Insurance and Finance (DIF)[1] final order requiring it to pay workers' compensation premiums to its carrier, SAIF Corporation, for two audit periods, covering February 1, 1987 through March 31, 1990. In particular, the Fair challenges DIF's determination that SAIF properly assessed premiums against the Fair's disbursement of vouchers for food and services and per diem payments to individuals providing services associated with the Fair. We reverse in part and affirm in part.

The Fair is a nonprofit, tax-exempt, charitable corporation that conducts a three-day fair during the second weekend of July each year. Approximately 30,000 people attended the fair in each of the audit years. In 1989, the Fair hired two regularly paid workers, a caretaker and general manager. It otherwise operated on "volunteer"[2] services.

There were two categories of volunteers. First, a "core group" of about 20 volunteers helped prepare the fair site for one month before the fair, and helped restore the site to its original condition for one week after the fair. Second, approximately 700 to 1000 volunteers (the "three-day volunteers") assisted during the three days of the fair, performing such tasks as directing traffic, staffing information booths, and transporting water.[3]

Members of the core group received a "per diem" payment of up to $25 per day for each day they worked before and after the fair, but not during the fair. Although the per diem payments were budgeted in advance, the actual disbursal of this money depended on the Fair's gate receipts and were distributed at the discretion of crew coordinators. In

---

[1] DIF is now known as the Department of Consumer and Business Services. *See* ORS 656.005(9).

[2] We use the term "volunteer" as shorthand to describe persons providing services to the Fair, regardless of whether such services were gratuitous or were, as amplified below, provided pursuant to a contract of hire.

[3] The three-day volunteers represented a wide range of occupations, *e.g.*, woodworkers, attorneys, carpenters, and landscapers. Core group volunteers might also serve as three-day volunteers.

addition to per diems, core group volunteers received free meals and campsites.

The three-day volunteers received vouchers which were intended to be exchanged for food or showers, but which could also be redeemed for cash at the end of the fair. A volunteer could receive one voucher, worth $2, for every hour worked, up to a maximum of eight vouchers per day. Distribution of vouchers was contingent on an ongoing projection of sufficient gate proceeds and, like the per diems, the vouchers were issued at the discretion of crew coordinators.

In 1990, SAIF conducted a premium audit of the Fair. SAIF concluded that the vouchers and per diems were paid to "subject workers" within the meaning of *former* ORS 656.005(27)[4] and were, thus, subject to accounting for purposes of premium assessment, yielding an additional premium assessment of $5,252. The Fair appealed, and DIF upheld the premium assessment on the ground that the individuals providing services to petitioner were subject workers.

The Fair argues that DIF erred in upholding SAIF's premium assessment for two reasons. First, neither the core group volunteers nor the three-day volunteers were "workers" under *former* ORS 656.005(27) because the Fair had no contract for remuneration with the volunteers and the volunteers were not subject to the Fair's direction and control. Second, the Fair argues that, even if the volunteers were "workers," they were exempt from workers' compensation coverage under ORS 656.027(10).[5] Because the analysis of these issues varies with respect to the core group volunteers and the three-day volunteers, we address each in turn.

_____

[4] *Former* ORS 656.005(27) was renumbered ORS 656.005(28) in 1990. Or Laws 1990, ch 2, § 3.

[5] In 1991 the legislature added ORS 656.027(19), which provides that a nonsubject worker is

"[a] person performing services on a volunteer basis for a nonprofit, religious, charitable or relief organization, whether or not such person receives meals or lodging or nominal reimbursements or vouchers for meals, lodging or expenses."

That provision does not apply to the facts of this case, because it was enacted after the audit period.

## Core Group Volunteers

■     Our analysis of the core group's receipt of per diem disbursements follows the methodology set out in *S-W Floor Cover Shop v. Natl. Council on Comp. Ins.*, 318 Or 614, 872 P2d 1 (1994). Thus, we first consider whether DIF correctly concluded that the core group volunteers were "workers" under *former* ORS 656.005(27). If we sustain DIF's determination in that regard, we must then determine whether the core group volunteers fall within one of the statutory "nonsubject worker" exemptions, including ORS 656.027(10).

*Former* ORS 656.005(27) provided, in part:

" 'Worker' means any person * * * who engages to furnish services for a remuneration, subject to the direction and control of an employer * * *."

ORS 656.005(13) provides:

" 'Employer' means any person * * * who contracts to pay a remuneration for and secures the right to direct and control the services of any person."

■     The Fair argues that it had no contract with the core group volunteers because those volunteers had no legally enforceable entitlement to consideration for their services, specifically including the per diem payments. In particular, the Fair argues that there was no enforceable entitlement to per diems because the actual amount to be paid was undetermined and at the discretion of the crew coordinators.

DIF made the following finding:

"If the crew coordinator's per diem requests were within the previously board-established budget, and the gate admissions were sufficient to cover the payments, the core group received the payments. If the crew coordinator's per diem requests exceeded the budget, or the gate admissions were insufficient to allow per diem payments, the fair coordinator denied the request. The core group workers knew that per diem payments were budgeted and that they would receive *some payment* if the petitioner's gate admissions were sufficient to allow disbursement of per diem payments." (Emphasis supplied.)

Thus, DIF found that, if the Fair's gate proceeds were sufficient, per diems *would* be paid, although a specific amount

was not guaranteed. That finding was supported by substantial evidence. ORS 656.298; ORS 183.482. In such circumstances, where "the expectation of pay is uncertain in the sense of being conditional on the prosperity of the enterprise[,]" there was a contract for hire between the Fair and the core group volunteers. 1B Larson, *Workmen's Compensation Law* 8-372, § 47.42(a) (1993).

■     Because there was a contract of hire, core group members were "workers" under *former* ORS 656.005(27), if they were subject to the Fair's direction and control. Four factors are material in determining whether an employer has the right to control an individual:

"(1) direct evidence of the right to, or the exercise of, control; (2) the method of payment; (3) the furnishing of equipment; and (4) the right to fire." *Castle Homes, Inc. v. Whaite*, 95 Or App 269, 272, 769 P2d 215 (1989).

If that inquiry is inconclusive, worker status is determined by reference to the "relative nature of the work" test. *See Woody v. Waibel*, 276 Or 189, 197, 554 P2d 492 (1976).

■     In concluding that the Fair had the right to control all of the volunteers, including the core group, DIF discussed the Fair's supervision of volunteers' activities consonant with the purposes of the fair. In particular, it found that the Fair developed plans to "coincide with its goals as stated in the by-laws" and organized various "work groups" that met throughout the year to carry out the plans. DIF concluded:

"While latitude is granted to individuals in carrying out [the plans], the overall goals and aims of the fair dictate the overall result. The petitioner might not concern itself with a particular individual's style of dress or manner of work, but the details of the work has [sic] been agreed upon and developed well before the commencement of the fair."

In these circumstances, the Fair's substantial supervision of the details of the volunteers' work was sufficient, by itself, to satisfy the "right to control" inquiry. *Accord* 1B Larson, *supra*, at 8-90 ("for the most part, any single factor is not merely indicative of, but, in practice, virtually proof of, the employment relation * * *"). Thus, DIF correctly concluded that the Fair had direction and control of the core group workers.

■    Having affirmed DIF's conclusion that core group members were "workers" for purposes of *former* ORS 656.005(27), we next consider whether they qualify for exemption under ORS 656.027(10). ORS 656.027(10) exempts from the definition of "subject worker":

> "A person performing services primarily for board and lodging received from any religious, charitable or relief organization."[6]

Under the exemption's "primarily" language, the value of the board and lodging workers receive must exceed the value of any other consideration received (here, the per diems). Otherwise, services are not performed "primarily" for food and lodging. Here, the Fair does not argue that the per diems were for food and lodging. Nor does the Fair argue that the value of the three free meals a day and the free campsite core group workers received was greater than the value of the per diems.

The Fair does, however, argue that the per diems are expense reimbursements and further argues that we should construe the exemption's "primarily" language to encompass expense reimbursements. We need not address that question of statutory construction because, even if we were to adopt the Fair's reading, the Fair presented no evidence that the amount of the per diems was in any way related to the core group's actual or estimated expenses. Indeed, DIF found that

> "the per diem was disbursed to workers based on the budget of the crew coordinator and the sufficiency of the gate admissions, and not based on a workers' actual food or lodging expenses."

The core group volunteers are not exempt under ORS 656.027(10). Petitioner's remaining assignments of error pertaining to the "core group" do not merit discussion. DIF did not err in upholding SAIF's additional premium assessment against the value of the per diems paid.

### Three-Day Volunteers

■    We need not address the Fair's arguments that the three-day volunteers were not "workers" under former ORS

---

[6] It is undisputed on appeal that the Fair is a charitable organization.

656.005(27) because we conclude that even if those volunteers were "workers," they were exempt under ORS 656.027(10).[7] As noted, ORS 656.027(10) exempts from coverage "a person performing services primarily for board and lodging * * *."

DIF concluded that the exemption was inapplicable because the vouchers could be exchanged for cash. In particular, DIF concluded that, notwithstanding its finding that "the majority of individuals used their vouchers in trade for food or showers," ORS 656.027(10) required an *individualized*, and not a generalized, determination of the use of the food vouchers. DIF reasoned that, because the Fair did not specifically identify which of the hundreds of three-day volunteers actually used the vouchers for food or showers and because individuals could, and did, exchange vouchers for cash, the vouchers were not "primarily" for board and lodging. We reject that analysis which ignores the predominant purpose and use of the vouchers.

By distributing vouchers, the Fair intended to provide its volunteers with food and showers. Typically, volunteers received four vouchers per day, which provided them with $8 for meals and a shower. The uncontroverted evidence before DIF showed that an average meal at the fair cost from $4 to $7, and that a shower cost $2. Consequently, the vouchers approximated and, if anything, were insufficient to cover, the actual cost of food and lodging at the fair. Nothing in the administrative record suggests that the Fair used vouchers as a subterfuge for cash payments. Moreover, unlike the core group, three-day volunteers received no additional cash consideration for their services. Thus, as a class, the three-day volunteers performed their "services primarily for board and lodging" in the form of the vouchers.

■ DIF's preoccupation with the potential for individual voucher/cash exchanges is misplaced. This case arises in the

---

[7] *S-W Floor Cover Shop v. Natl. Council on Comp. Ins., supra,* 318 Or at 630, counsels that the preferred methodology is to determine "whether one is a 'worker' before a determination is made as to whether that 'worker' is a 'nonsubject' worker pursuant to one of the exemptions * * *." Here, however, any discussion of the "contract for remuneration" and "right of control" elements of "worker" status would greatly, and ultimately needlessly, extend our analysis of the three-day volunteers.

context of a premium audit. SAIF assessed a premium based on the Fair's *total* expenditures for vouchers; SAIF's audit did not involve an individualized determination. The fact that any given individual could have redeemed some or all of his or her food vouchers for cash does not alter the fundamental and dispositive fact that "the majority of [three-day volunteers] used their vouchers * * * for food and showers." In this generic premium audit context, that generalized determination is sufficient. DIF's order sustaining SAIF's assessment of compensation premiums based on the value of the vouchers was error.

Reversed as to premium charged on the value of food vouchers; otherwise affirmed.